## AFFIDAVIT

I, Justin Stern, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1.      I have been a Special Agent with the FBI since December of 2004.  I am the primary Case Agent for this investigation.  As the primary Case Agent, I am familiar with the facts of the case.  As a part of my training, I received seventeen weeks of investigative training at the FBI Academy in Quantico, Virginia.  Since completing training, I have participated in numerous criminal investigations.  These investigations have utilized physical and electronic surveillance, financial analysis, interviews, surreptitious recordings, undercover operations, search warrants, arrests, utilization of informants, seizure and analysis of computer information and various other techniques.  I am currently assigned in Boulder, Colorado; a small satellite office of the FBI's Denver Division.  In this capacity, I am responsible for investigating all federal criminal violations under the FBI's purview.  During my career with the FBI, I have investigated organized crime, drugs, gangs, violent crime, firearms, financial crime and money laundering for the majority of my career.

2.      This affidavit is submitted in support of an application for search warrants for the following:

A.      A single family house located at 5515 South Boulder Road in Boulder, Colorado, 80303 in unincorporated Boulder County (hereinafter SUBJECT PREMISES), described herein and in **ATTACHMENT A**, there being probable cause to believe that located at the SUBJECT PREMISES are items described in **ATTACHMENT B** being evidence, fruits, and instrumentalities of violations of federal law, including Title 18, United States Code, Sections 844(h) (arson to commit mail and wire fraud); 922(g) (felon in possession of a firearm), 1028A (aggravated identity theft), 1343 (wire fraud) and 1344 (bank fraud) as well as federal drug laws, including Title 21, United States Code, Sections 841(a)(1) and (b), regarding the possession and distribution of methamphetamine, heroin and oxycodone, and 843(a)(3) (acquiring controlled substances through fraud) (collectively, the "SUBJECT CRIMES").

B.      A device, more fully described in **ATTACHMENT C**, and the data located therein, there being probable cause to believe that located in the place described in **ATTACHMENT C** are items described in **ATTACHMENT D**, being evidence, fruits, and instrumentalities of the SUBJECT CRIMES.

3.      Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of the SUBJECT CRIMES are located in the places described in **ATTACHMENTS A** and **C**.

4.      The facts set forth in this affidavit are based on my personal knowledge as the investigation's Case Agent; my training and experience; knowledge obtained from other

1

individuals including law enforcement officers/personnel; and my review of reports and other evidence.  Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge.

## IDENTIFICATION OF THE DEVICE(S) TO BE EXAMINED

5.      A cellular telephone is currently held by the Boulder County Sheriff's Office ("BCSO") Evidence Section, which was collected as property from SHAWN MICHAEL VENCEL incident to VENCEL's arrest by the Denver Police Department on October 7, 2019.  It is being maintained as part of BCSO case number 19-4024 as item AJM-1 at BCSO, 5600 Flatiron Parkway, Boulder, Colorado 80301.  The items is a black Apple iPhone in a black case, hereinafter and in **ATTACHMENTS C** and **D** the "SUBJECT DEVICE."

6.      I submit there is probable cause to believe that the SUBJECT DEVICE is or contains evidence, fruits, and instrumentalities of violations of the SUBJECT CRIMES.  The applied-for warrant would authorize the forensic examination of the SUBJECT DEVICE for the purpose of identifying electronically stored data particularly described in **ATTACHMENT D**.

7.      The SUBJECT DEVICE is currently in the lawful possession of the BCSO.  It came into the BCSO's possession after custody of VENCEL's person was transferred to the Boulder County Sheriff's Office for an appearance in Boulder County's state judicial district.

8.      In my training and experience, I know that the SUBJECT DEVICE is being stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT DEVICE first came into the BCSO's possession.

## VERBAL CONSENT HAS BEEN OBTAINED TO SERACH THE SUBJECT PREMISES

9.      The SUBJECT PREMISES is owned by SHAWN MICHAEL VENCEL.  As set forth in more detail below, VENCEL told me on October 10, 2019, that there are three firearms inside the SUBJECT PREMISES.  VENCEL gave me verbal consent to obtain these firearms.  While I thus may already have the authority I need to seize them, I seek this warrant to be certain that any entry into the SUBJECT PREMISES complies with the Fourth Amendment and other applicable laws.  Additionally I seek the Court's authorization to search for and seize other items of evidence, fruits and instrumentalities of the SUBJECT OFFENSES not authorized by VENCEL as described in **ATTACHMENT B**.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

10.     Based on my training and experience, I know that a cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and

storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites. Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts.

11.     Cellular telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They may also include GPS technology for determining the location of the device. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data. Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. Some cellular telephones also operate as a "tablet," or mobile computer, and can contain software programs called applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet. Some cellular telephones also contain digital cameras and software related to the taking of digital photographs. Smartphones thus may contain in one device the functions of the following devices:

A.     GPS Navigation devices. A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

B.     Personal Digital Assistants. A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For

example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

       C.     Tablets.  A tablet is a mobile computer — typically larger than a phone yet smaller than a notebook — that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called applications ("apps"), which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

       D.     A solid-state drive ("SSD"), also known as a solid-state disk, is a data storage device that uses integrated circuit assemblies as memory to permanently store data instead of using rotating platters.

       E.     Portable Media Players.  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

       F.     Routers and Modems.  Computer routers and modems are also used as instrumentalities of crimes.  Modems and routers can contain information about dates, IP addresses, MAC addresses, frequency, and computer(s) used to access the Internet, and some have separate digital storage capacity that allow them to connect to other devices and to store information similar to an external digital storage device like a flash card or thumb drive.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device or the computers and devices connected to it.

       G.     Digital Cameras.  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable digital storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media includes various types of flash memory cards and miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos such as texts, word processing documents, or web pages.  If the camera is equipped with GPS technology, that information may be recorded as metadata associated with the photographs and videos taken with that camera as well as other information such as the make and model of the camera and the date and time the image was created.  Some cameras and removable storage media are now equipped with wireless capabilities, which allow for images and files to be uploaded from the camera or digital storage media directly to the Internet or to other digital storage devices or computers using a wired or wireless connection.

12.     "Computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and can include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

13.     Based on my knowledge, training, and experience, I know that computers and digital storage devices can store information for long periods of time.  Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device.  This information can sometimes be recovered with forensic tools.

14.     Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

15.     There is probable cause to believe that things that were once stored on the SUBJECT DEVICE may still be stored there, for at least the following reasons:

A.     Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

B.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

C.     Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

D.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

16.     *Forensic evidence.*  As further described in Attachment D, this application seeks permission to locate not only electronically stored information on the SUBJECT DEVICE that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE was used, the purpose of the use, who used the SUBJECT DEVICE, and when the SUBJECT DEVICE was used.  There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICE because:

A.      Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.  This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

B.      Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C.      A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

D.      The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

F.      I know that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for

6

evidence of crime. From my training and experience, I believe that an electronic device used to commit the SUBJECT CRIMES may contain: internet searches/activity and social media activity involving researching, impersonating or otherwise aiding in VENCEL's defrauding of an individual identified as VICTIM DOCTOR 1; financial transactions related to or consisting of fraudulent conduct;, information about bank accounts where fraudulent proceeds are stored; correspondence with others, to possibly include additional victims related to identity theft and or fraud; location information relevant to drug transactions, photographs of drug-related activity, including photographs of others engaged in drug use, and photographs of drugs and money; records of internet searches/activity related to drug activity or of VENCEL's drug associates; records and information describing VENCEL's state of mind during the time period set forth below.

G.      I also know that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

H.      The size of the electronic storage media (commonly referred to as a hard drive) used in smartphones has grown tremendously within the last several years. Phones containing hard drives with a capacity of 64 gigabytes are not uncommon. These drives can store thousands of images and videos at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with video capture capabilities, and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime". Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

17.      *Need to review evidence over time and to maintain entirety of evidence.* I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in ATTACHMENT D in order to prevent unnecessary invasion of privacy and overbroad searches. I advise it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. I have learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. I have learned from that experience, as well as other investigative efforts, that

multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment D.  In order to obtain the full picture and meaning of the data from the information sought in Attachments C and D of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

18.     *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the SUBJECT DEVICE consistent with the warrant.  The warrant I am applying for would authorize a later examination and perhaps repeated review of the SUBJECT DEVICE or information from a copy of the SUBJECT DEVICE consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the SUBJECT DEVICE to human inspection in order to determine whether it is evidence described by the warrant

## THERE IS PROBABLE CAUSE TO BELIEVE THAT SHAWN VENCEL COMMITTED THE SUBJECT CRIMES

19.     On October 8, 2019, I initiated an investigation of SHAWN MICHAEL VENCEL based in part, by information, evidence and investigation conducted by local Colorado law enforcement agencies, including: Boulder County Drug Task Force, BCSO, Boulder Police Department, Broomfield Police Department and Arvada Police Departments.  My investigation concerns VENCEL's various alleged criminal activities such as: fraudulent acquisition of large quantities of prescription medication, specifically oxycodone; identity theft and defrauding of an individual known to me but identified in this Affidavit as VICTIM DOCTOR 1, whose identity is known to me, and concurrent defrauding of financial institutions, other businesses and individuals; prohibited possession of firearms and ammunition; and other acts.

**I.     There is Probable Cause to Believe that SHAWN MICHAEL VENCEL has Fraudulently Adopted the Identities of VICTIM DOCTOR 1 and Others to Commit Bank and Wire Fraud Having Also Committed Bank Fraud using his Own Identity**

20.     I have reviewed information from Broomfield Police Department case number 2019-00022774.  The case describes the following incidents:

A.     On or about April 19, 2019 an employee of VICTIM CAR DEALERSHIP (I know the identity of both the employee and VICTIM CAR DEALERSHIP) reported that an

approved loan in the amount of $52,514.04 on April 1, 2019 was fraudulent.  The loan had been obtained by a man using the name of VICTIM DOCTOR 1 and presented a Texas driver's license in VICTIM DOCTOR 1's name as well as supporting documents bearing VICTIM DOCTOR 1's name; specifically a supposed waste management service bill (which also contained the address of the SUBJECT PREMISES) and automobile insurance.  The man used VICTIM DOCTOR 1's identity to purchase a grey Ford F150.  The man purporting to be VICTIM DOCTOR 1 listed the SUBJECT PREMISES as VICTIM DOCTOR 1's mailing address on the loan documents; he also listed his cellular telephone number on the loan documents as 720-725-8189.  Later, on April 26, 2019, another employee of VICTIM CAR DEALERSHIP was shown a photo array that included a photo of SHAWN MICHAEL VENCEL.  The employee identified VENCEL as the person who had taken out the loan as VICTIM DOCTOR.

        B.        The loan that was used to purchase the Ford F-150 was issued by VICTIM BANK 1, the identity of which is known to me.  I went to the website of VICTIM BANK 1 on October 16, 2019.  The website contains information that VICTIM BANK is FDIC insured.

        C.        The same employee who identified VENCEL in the photo array also exchanged text messages with the same telephone number VENCEL listed on the loan application, 720-725-8189, regarding VENCEL's fraudulent purchase of the pickup truck posing as VICTIM DOCTOR 1 and a possible fishing trip.  I have reviewed a screenshot of a text message received by the employee from VENCEL posing as VICTIM DOCTOR 1, dated April 4 at 9:14 a.m.[1]  A portion of the exchange reads as follows [verbatim]:

> VENCEL:  "Yo what's the deal with financing?  I'm about to bring it back and buy one from a dealer that has it together."
>
> Employee:  "We have it together.  We have a breakdown.  I will be having them call after our meetings.  Sorry for the delay i was off some yesterday and was under the weather."
>
> VENCEL:  Dude it is not you at all.  You did a great job!"  [text continues]

        D.        On April 25, 2019, a Broomfield Police Department detective identified and interviewed VICTIM DOCTOR 1 in Texas.  VICTIM DOCTOR 1 reported that he had filed a police report with the Houston Police Department.  VICTIM DOCTOR 1 said he did not know VENCEL and that VENCEL had attempted to purchase several automobiles, opened numerous credit cards and attempted to lease rental property using VICTIM DOCTOR 1's identity.  VICTIM DOCTOR 1 later sent the detective a list of inquiries and calls related to fraudulent activity on VICTIM DOCTOR 1's credit report, which included multiple inquiries regarding credit cards, bank accounts, car loans, a rental property, and a Sallie Mae loan.

---

[1] The screenshot does not identify the year of the text message.  However, its context leads me to believe that it was sent in 2019.

   E. On April 26, 2019, a Broomfield Detective received a call from VICTIM LANDLORD 1, whose identity is known to me.  VICTIM LANDLORD 1 explained that a man representing himself to be VICTIM DOCTOR 1 had tried to rent a residential property in Superior, Colorado.  VICTIM LANDLORD 1 became suspicious in part by some of VENCEL's statements concerning his supposed medical training and experience.  VICTIM LANDLORD 1 then located and spoke to the real VICTIM DOCTOR 1 in Texas, who said that VICTIM DOCTOR 1 was the victim of identity theft.

   F. On April 30, 2019 officers with the Broomfield Police Department interviewed VENCEL when he arrived at VICTIM CAR DEALERSHIP driving the Ford F150 he had obtained using a loan in VICTIM DOCTOR 1's name.  VENCEL identified himself using his real name and presented a Colorado identification card.  VENCEL told the officers that the truck belonged to his boss, VICTIM DOCTOR 1, and that he and VICTIM DOCTOR 1 worked at a company called Mile High Defenders.  VENCEL said that he had purchased the Ford F150 for VICTIM DOCTOR 1.  Moreover, VENCEL stated that VENCEL and VICTIM DOCTOR 1 were "basically brothers."  VENCEL initially denied driving the truck to the dealership, but eventually admitted it.  Upon concluding the interview, the officers arrested VENCEL.

   G. Broomfield Police Department officers searched the F150 VENCEL drove to VICTIM CAR DEALERSHIP.  Inside the glove box, they found receipts from sporting goods stores as well as Moneygram and Moneytree;[2] two of these receipts listed VICTIM DOCTOR 1 as the sender of the funds.  Officers found two baggies with substances that field-tested positive for heroin, and meth.[3]  In the bed of the truck the officers found sporting goods, as well as two soft cases containing ammunition.  One of the cases contained eight loaded magazines.  Seven of the magazines were thirty-round magazines containing either 5.56 or .223 ammunition.  The other magazine was described as smaller, also containing either 5.56 or .223 ammunition.  An orange container was located with a large, unspecified quantity of additional 5.56 and .223 ammunition.  A camouflage soft-case was location containing various shotgun shells and 9mm ammunition.[4]  Inside the middle console the officers found syringes, pipes, a cap

---

[2] I know, from my training and experience, that Moneygram and Moneytree are money transfer/services companies that allow users to send and receive cash across the United States as well as offer other financial services.

[3] Unless otherwise explicitly stated, all of the illicit controlled substances described in this affidavit field/presumptive tested positive for the presence of the represented drug.  Field/presumptive tests are not always accurate.  They are nevertheless helpful to law enforcement because they provide additional information showing that a substance, present with other drug paraphernalia or in circumstances consistent with illicit drug use, is actually a controlled substances.  When a field/presumptive test corroborates suspicions that a mixture or substance is a controlled substance, the field/presumptive-tested substance is booked into evidence and set aside for future testing by a specially-equipped lab that can perform much more accurate tests.

[4] The report does not specify whether the shells and ammunition were simply casings, or actual loaded ammunition.

with cotton, and a needle containing a substance that field-tested positive for liquid heroin.  They also found Title paperwork for a house in foreclosure and mail from banks addressed to VICTIM DOCTOR 1.  The officers also found two checks to VICTIM TITLE COMPANY, described below.

21.     I have reviewed information from Arvada Police department case number 2019-011125.  The information describes a May 24, 2019 complaint by VICTIM LANDLORD 2, whose identity is known to me.

A.     VICTIM LANDLORD 2 told the Arvada Police Department that he had received an application for a residential rental property in Arvada, Colorado.  The application was completed in VICTIM DOCTOR 1's name accompanied by a signature; listed VICTIM DOCTOR 1's Social Security number; login credentials for Credit Karma;[5] employment and personal references.  The man purporting to be VICTIM DOCTOR 1 sent VICTIM LANDLORD 2 a text message with a photo of a Texas Driver's license in VICTIM DOCTOR 1's name.  The man posing as VICTIM DOCTOR 1 supplied VICTIM LANDLORD 2 with a copy of a paystub from a hospital.  VICTIM LANDLORD 2 also located a Facebook profile in VICTIM DOCTOR 1's[6] name.  The man and VICTIM LANDLORD 2 negotiated via the exchange of text messages.

B.     The man purporting to be VICTIM DOCTOR 1 and VICTIM LANDLORD 2 also had a short email exchange.  An Arvada Police officer reviewed the emails, which revealed that the imposter stated, among other things: he was from Houston, Texas; claimed to be an ear, nose and throat physician; discussed his income and living arrangements; and discussed his credit scores as being sufficient to make the rent.

C.     On May 21, 2019, the man purporting to be VICTIM DOCTOR 1 came to visit the rental property with a three-year old girl and a girlfriend.  The man signed a lease using VICTIM DOCTOR 1's name and provided a cashier's check for $3,000.  VICTIM LANDLORD 2 later asked VICTIM LANDLORD 2's mother, who worked at a bank, to authenticate the cashier's check and was informed that it was not legitimate.

D.     Thereafter, VICTIM LANDLORD 2 used the internet to locate a medical doctor with the name of VICTIM DOCTOR 1 living in Texas.  VICTIM LANDLORD 2 called VICTIM DOCTOR 1, who denied filling out a lease application or having a cashier's check

---

[5] The website at www.creditkarma.com, which I accessed on October 14, 2019, describes the company as one offering free credit reports and free credit scores as well as other financial services.

[6] An FBI computer scientist has also located a publicly-available Facebook profile in the name of VICTIM DOCTOR 1.  The Facebook profile for VICTIM DOCTOR 1 falsely presents pictures of the man I know to be SHAWN MICHAEL VENCEL as VICTIM DOCTOR 1.  The Facebook profile also shows VENCEL with a minor female whose features would be consistent with an child approximately three years old.

issued in his name.  VICTIM DOCTOR 1 told VICTIM LANDLORD 2 that someone had been using his identity to buy things and that the case was being investigated by the Broomfield Police Department (the same investigation previously described in this affidavit).

       E.      VICTIM LANDLORD 2 was shown a photo array that included a photograph of SHAWN MICHAEL VENCEL.  VICTIM LANDLORD 2 identified VENCEL as the man who had presented himself as VICTIM DOCTOR 1.

     22.     An Arvada Police Department officer called the actual VICTIM DOCTOR 1 at his office in Texas.  VICTIM DOCTOR 1 stated that his identity had been compromised by individuals in numerous jurisdictions in the United States, including Colorado.  VICTIM DOCTOR 1 stated, among other things, that he did not apply for a rental in Arvada; communicate with VICTIM LANDLORD 2 concerning the rental; sign a lease agreement, or rental documents; or issue a $3,000 cashier's check.

     23.     On May 30, 2019, SHAWN MICHACEL VENCEL was arrested by Arvada Police Department officers when he arrived at VICTIM LANDLORD 2's rental property upon VENCEL's arrival in a Jeep Cherokee.  Officers seized two clear baggies and a loaded syringe from the driver's side door of the Jeep Cherokee.  The officers later conducted presumptive tests for the seized drugs; which yielded positive results for methamphetamine and heroin.

     24.     Also on May 30, 2019, SHAWN MICHAEL VENCEL was interviewed at Arvada Police Department's headquarters after being advised of and waiving his *Miranda* rights. My review of a written report of the interview reveals VENCEL stated the following, among other things:

       A.      VENCEL purchased an identity packet for $1,000 from a man named "AUSTIN" who assured him that the identity did not belong to a real person.  As part of the packet, VENCEL received a Texas driver's license in the name of VICTIM DOCTOR 1 and a credit report with VICTIM DOCTOR 1's Social Security number.

       B.      VENCEL admitted he made a cashier's check and a pay stub by conducting online research and with AUSTIN's assistance.  VENCEL attempted to lease the property in VICTIM DOCTOR 1's name because VENCEL did not believe that he could secure the lease using his real identity, with his own credit history, because of medical bills related to a cancer diagnosis.  VENCEL admitting to representing himself as VICTIM DOCTOR 1 throughout the leasing process.

       C.      VENCEL initially said the drugs found in the Jeep Cherokee belonged to someone else and denied being a drug user.  However, VENCEL eventually stated that the drugs were his; that his life had been going downhill since he started using drugs; and that his addiction began with painkillers after arm surgery.

     25.     I have reviewed information from BCSO case number 19-5320.  The information reveals that on or about September 11, 2019, two BCSO deputies went to the SUBJECT PREMISES to meet with VENCEL RELATIVE 1, who had power of attorney for her mother,

VENCEL RELATIVE 2.  VENCEL RELATIVE 1 sought to pick up clothing, mail and other items for VENCEL RELATIVE 2 and, with the deputies present, was granted permission to enter the house by someone the reports identify only as a "roommate."  While in the garage of the SUBJECT PREMISES, VENCEL RELATIVE 1 gave one of the deputies documents related to financial services and credit cards in the names of people other than VENCEL, including a "Go Pass" for the Northwest Parkway in the name of VICTIM DOCTOR 1, who was identified in the documents as residing at the SUBJECT PREMISES.

26.    I have reviewed case reports from Boulder Police Department case number 19-04950.  The reports reveal that on or about May 8, 2019 officers responded to a call from BANK EMPLOYEE, whose identity is known to me, who reported that SHAWN MICHAEL VENCEL had used fraudulent checks to take approximately $5,387.78 from VICTIM BANK 2, the identity of which is known to me.  I went to the website of VICTIM BANK 2 on October 16, 2019.  The website contains information that VICTIM BANK 2 is FDIC insured.  BANK EMPLOYEE stated VENCEL went to VICTIM BANK 2 on January 29, 2019 to open an account in the name of a business called Mile High Defenders, LLC.  On or about February 6, 2019, VENCEL deposited a check in the amount of $2,788.56 at a branch bank in Boulder, Colorado.  The address listed on the check was the SUBJET PREMISES.  On or about February 7, 2019 VENCEL deposited another check for $2,500 at another branch in Broomfield, Colorado.  VENCEL then made ATM purchases and withdrawals from the account before the bank became aware that the checks were fraudulent.  Thereafter, a BPD detective interviewed an employee of the company identified as the paying party of the $2,500 check.  The interview revealed that the check in question did not pass through the company's legitimate account.  The BPD detective also learned that the supposed issuing bank for the check in the amount of $2,788.56 was a mobile-only bank (online only) that does not issue paper checks.

27.    A report maintained in case number 19-04950 also showed that on or about April 15, 2019, VENCEL presented two checks from that same mobile-only bank — one for $32,492.89 and one for $18,631.19 — to VICTIM TITLE COMPANY, as part of a real estate closing transaction involving the SUBJECT PREMISES.  The mobile-only bank limits account holders using its checkbook feature to amounts of less than $5,000, thus indicating that these checks were also forged.  A lawyer for VICTIM TITLE COMPANY confirmed that the checks were invalid.  As set forth above in paragraph 20(G), Broomfield police officers found these two checks in the fraudulently obtained F150 VENCEL drove to VICTIM CAR DEALERSHIP on April 30, 2019.

## II.    There is Probable Cause to Believe that SHAWN MICHAEL VENCEL —a Felon Prohibited From Possessing Firearms —Has Possessed Firearms

28.    On September 24, 2019 and October 10, 2019, I caused queries of SHAWN MICHAEL VENCEL's criminal history via the National Crime Information Center and a Colorado Courts database.  The databases revealed that on June 11, 2018, VENCEL was convicted of felony Vehicular Eluding in Colorado state court, Jefferson County.  The underlying offense occurred on August 4, 2017.

29.     As set forth above, I have reviewed a copy of reports from Broomfield Police Department case number 2019-00022774 describing an incident in which SHAWN MICHAEL VENCEL used VICTIM DOCTOR 1's identity to obtain a loan for the purchase of a car from VICTIM CAR DEALERSIP.  As set forth in those reports, officers seized numerous receipts from sporting goods stores and ammunition, which VENCEL is prohibited from possessing.

### III.    There is Probable Cause to Believe that SHAWN MICHAEL VENCEL Obtains Controlled Substances Through Fraudulent Pretenses and that he Obtains Other Drugs

30.     I have reviewed reports from Boulder Police Department case number 19-05043. Those reports describe an incident whereby SHAWN MICHAEL VENCEL is alleged to have obtained 120 pills of oxycodone, a controlled substance, by means of a fraudulent prescription. On or about May 10, 2019, officers responded to a call from PHARMACIST 1, whose identity is known to me.  PHARMACIST 1 reported that PHARMACY TECH, whose identity is also known to me, had received a fraudulent prescription in the name of VENCEL RELATIVE 2 from a man identifying himself as SHAWN VENCEL.  The prescription bore a signature in the name of VICTIM DOCTOR 2, but VICTIM DOCTOR 2's office manager, whose identity is known to me, reported to PHARMACIST that VICTIM DOCTOR 2 did not write the prescription and had not written any prescriptions for VENCEL RELATIVE 2 since March 2019.  PHARMACIST 1 reported that VENCEL had previously filled another prescription for VENCEL RELATIVE 2 in April, 2019.  When officers interviewed VENCEL RELATIVE 2 at the SUBJECT PREMISES on May 11, 2019, she stated that she had a prescription for back pain, but had not been to the doctor for about a month.  She told the officers that she had found the prescription on an end table in her entryway and had decided to get it filled.

31.     I have reviewed reports from Boulder Police Department case number 19-07244, which describe an incident in which SHAWN MICHAEL VENCEL is alleged to have obtained oxycodone by means of a fraudulent prescription.  On July 2, 2019, officers responded to a call from PHARMACIST 2, whose identity is known to me.  PHARMACIST 2 told the officers that on June 29, 2019, at approximately 10:00 a.m., a man identified as VENCEL attempted to fill a an unsigned prescription for 360 30mg tablets of oxycodone.  PHARMACIST 2 did not fill the prescription because it had not been signed.  VENCEL returned on June 29, 2019, at approximately 2:00 p.m., with a prescription allegedly signed by VICTIM DOCTOR 2. Thereafter, PHARMACIST 2 filled the prescription.  VENCEL paid $999.99 by check.

32.     On July 1, 2019, at approximately 12:00 p.m., PHARMACIST 2 was notified that the check used by SHAWN MICHAEL VENCEL to pay for the prescription — which listed SUBJECT PREMISES as the address — was not valid.  At that point, PHARMCIST 2 called VICTIM DOCTOR 2's office manager and learned that VICTIM DOCTOR 2 had not written the prescription.  Moreover, the officer manager advised PHARMACIST 2 that VENCEL had not been a patient at the practice for at least three years.  PHARMACIST 2 provided officers with a

copy of a Prescription Drug Monitoring Program ("PDMP")[7] report showing that VENCEL had purchased approximately 480 tablets of oxycodone between October 16, 2018 and June 12, 2019.

33.     I have reviewed reports from BCSO case number 19-5379.  The reports reveal that on September 18, 2019, a detective and deputies executed a Colorado state search warrant for a 2015 Black Cadillac Escalade registered to SHAWN MICHAEL VENCEL.  BCSO located the vehicle unattended in Boulder County on September 13, 2019.  The Escalade had significant damage to its front left, where it appeared to have hit a tree.  Inside the vehicle, the detective and deputies located, among other things: blank checks and printing instructions; a one ounce gold bar in packaging form eBay; blank prescription paper; a torn-up prescription for Oxycodone issued to VENCEL RELATIVE 2; a laptop; a laserjet printer with blank prescription paper in the tray.

**IV.     There is Probable Cause to Believe that SHAWN MICHAEL VENCEL Intentionally Set Fire to the Garage of the Subject Premises as Part of a Scheme to File a False Insurance Claim**

34.     VENCEL RELATIVE 1 told me that VENCEL RELATIVE 1 believes that the fire that occurred in the garage of the SUBJECT PREMISES was the result of arson.  VENCEL RELATIVE 1. suspects that the fire was intentional, in part, because VENCEL RELATIVE 1 had her deceased brother's 1979 Chevrolet Corvette removed from the garage the day before the fire's occurrence.  The Corvette's removal angered VENCEL.  Additionally, VENCEL RELATIVE 1's suspicion was heightened when VENCEL RELATIVE 1 learned that the results of a fire-investigation into its cause was deemed to be electrical.  VENCEL RELATIVE 4, whose identity is known to me, with whom VENCEL RELATIVE 1 is on poor terms, is an electrician.

35.     I have obtained and reviewed copies of BCSO reports from case number 19-5570.  The reports concern the garage fire that occurred at the SUBJET PREMISES on September 21, 2019; VENCEL RELATIVE 2 reported the fire to BCSO on September 22, 2019.  One of the reports states that VENCEL RELATIVE 1 suspected foul play was involved in the fire because VENCEL [initially misnamed in the report and later corrected] had begun selling VENCEL RELATIVE 1's parents' possessions; while also throwing things out on the front lawn of the SUBJECT RESIDENCE and acting erratically.  The report also notes that a fire investigator from the Boulder Fire Department conducted a full investigation of the fire and found no foul play.  Another report from this case summarizes the conclusions of the fire investigation report from Boulder Fire Department Chief Fire Marshall David Lowery.  I have not yet obtained a copy of the fire investigation report.  The summarized conclusions were:

---

[7] The PDMP is an electronic database maintained by the State of Colorado's Board of Pharmacy.  Pursuant to state law all medical providers with an active DEA registration allowing for the prescription of controlled substances are required to register with the program.  As part of the program pharmacies provide information about filled prescriptions for controlled substances, including the date the prescription was dispensed, the name of the patient and the practitioner, the name and amount of the controlled substance , the method of payment, and the name of the dispensing pharmacy.

A.  Origin of fire/explosion – inside of garage
B.  Heat source – unknown
C.  Fuel source – unknown what the initial fuel was.  The garage and its contents serviced as the fuel once the fire developed beyond the incipient stage.
D.  Event – unknown
E.  Fire cause – unknown

36.     On October 16, 2019, VENCEL RELATIVE 1 advised me that approximately one week prior, VENCEL RELATIVE 1's mother opened a forwarded letter to VENCEL RELATIVE 1's home from the SUBJECT RESIDENCE.  The letter was addressed to VENCEL RELATIVE 4 at the SUBJECT ADDRESS.  VENCEL RELATIVE 1's mother inadvertently opened the letter.  VENCEL RELATIVE 1 sent me a photograph of the letter, which I have reviewed.  The letter was from VICTIM INSURANCE COMPANY in Wisconsin.  The letter was dated September 26, 2019.  The letter concerned a subrogation matter involving claim number 01-001-890317 where a date of loss occurred on September 21, 2019.  The policy number was identified as 05PD016001.

37.     Also on October 16, 2019, I located VICTIM INSURANCE COMPANY's website.  In the "Company Information" section of the website I located information that stated the company's home/property insurance underwriting business was domiciled in Wisconsin.

**THERE IS PROBABLE CAUSE TO BELIEVE THAT THE SUBJECT DEVICE AND THE SUBJECT PREMISES CONTAIN EVIDENCE, FRUITS AND INSTUMENTALITIES OF THE SUBJECT CRIIMES**

38.     On October 7, 2019, the Denver Police Department arrested SHAWN MICHAEL VENCEL by virtue of approximately eight arrest warrants issued by multiple jurisdictions within the state of Colorado for variety of charges including, but not limited to: forgery, identity theft, criminal impersonation, motor vehicle left violation of bail-bond and drug-related offenses.  The officers identified VENCEL by fingerprint after VENCEL provided the officers with a fictitious name, "Josh Mercier."  The SUBJECT DEVICE was collected as property from VENCEL incident to VENCEL's arrest and later seized as evidence by the BCSO after VENCEL's transfer to the Boulder County Jail.

39.     On October 14, 2019, I interviewed VENCEL RELATIVE 1. via telephone.  Among other things, VENCEL RELATIVE 1 told me that VENCEL RELATIVE 1 has power of attorney for VENCEL RELATIVE 2.   VENCEL RELATIVE 3, husband of VENCEL RELATIVE 2, told VENCEL RELATIVE 2 that ammunition may still be present in a freezer in the burned garage of the SUBJECT PREMISES.  The ammunition belong to VENCEL or VENCEL's father.

40.     According to VENCEL RELATIVE 1 On September 6, 2019, VENCEL and VENCEL RELATIVE 2were involved in a domestic dispute.  At that time, VENCEL, VENCEL RELATIVE 2 and VENCEL RELATIVE 3 were living together at the SUBJECT PREMISES.  Thereafter, VENCEL RELATIVE 1 and VENCEL RELATIVE 1's spouse began caring for VENCEL RELATIVES 2 and 3.  On September 11, 2019, VENCEL RELATIVE 1 and VENCEL RELATIVE 1 SPOUSE traveled to the SUBJECT PREMISES to retrieve some of

VENCEL RELATIVES 2 and 3's belongings.  While there, VENCEL RELATIVE 1 found credit card applications addressed to other individuals at the SUBJECT PREMISES.  The credit card applications were located on a countertop.  The applications bore the address of the SUBJECT PREMISES.  VENCEL RELATIVE 1 suspected the applications could involve fraud and provided them to deputies, who were also present.  Thereafter, VENCEL RELATIVE 1 arranged to have mail from the SUBJECT PREMISES forwarded to VENCEL RELATIVE 1's home.

41.    Also on October 14, 2019, I interviewed VENCEL RELATIVE 1 SPOUSE, whose identity is known to me via telephone.  Among other things, VENCEL RELATIVE 1 SPOUSE told me that since mail was being forwarded to the home of VENCEL RELATIVE 1 and SPOUSE, approximately four to seven items of forwarded mail addressed to the SUBJECT PREMISES were delivered.  These items included credit card applications and other financial services companies such as Green Dot and Charles Schwab, addressed to VENCEL.  VENCEL RELATIVE 1's spouse shredded these items.  Approximately one week ago, the mail forwarding service was amended so that just the mail of VENCEL RELATIVES 2 and 3 was forwarded from the SUBJECT PREMISES to VENCEL RELATIVE 1 and SPOUSE's home.

42.    VENCEL RELATIVE 1 SPOUSE told me that on or about October 10, 2019, VENCEL RELATIVE 1 SPOUSE accessed the SUBJECT PREMISES to retrieve some of VENCEL RELATIVE 2 and 3's possessions.  While doing so, VENCEL RELATIVE 1 SPOUSE observed what VENCEL RELATIVE 1 SPOUSE believed to be drugs and drug paraphernalia in the bedroom of the SUBJECT PREMISES.  Specifically VENCEL RELATIVE 1 SPOUSE observed a glass pipe, lighter and a small blue plastic baggie containing an unknown white substance believed to be drugs.  VENCEL RELATIVE 1 SPOUSE photographed the items.  VENCEL RELATIVE 1 SPOUSE left the items in place at the SUBJECT PREMISES.  I have reviewed the photograph.  The items appear consistent with possibly drugs and drug paraphernalia.  This is the  photograph, with the suspected drugs and paraphernalia circled in red:



VENCEL RELATIVE 1 SPOUSE also reported to me that VENCEL RELATIVE 1 SPOUSE did not observe any suspicious documents at the SUBEJCT PREMISES at that time.

43.    Additionally, approximately one month ago, VENCEL RELATIVE 3 told VENCEL RELATIVE 1 SPOUSE that a firearms safe was located in the fire-damaged garage at the SUBJECT PREMISES.  According to VENCEL RELATIVE 3, the safe contained handguns and rifles that belonged to SHAWN MICHAEL VENCEL.  When VENCEL RELATIVE 1 SPOUSE traveled to the SUBJECT PREMISES on October 3, 2019, VENCEL RELATIVE 1 SPOUSE saw the firearms safe in the fire-damaged garage.  The safe weighs approximately one thousand pounds.  The safe has the following approximate dimensions: four feet by four feet by six feet.  The safe has a dark color and a combination dial.  The safe is located on the east side of the burned-down garage, approximately ten feet from the main garage doors accessed by vehicles.  VENCEL RELATIVE 1 SPOUSE took a photograph of the fire-damage garage which shows the firearms safe.  I have reviewed the photograph.  A safe appears to be present on the right-hand side of the image.  This is the photograph, with the suspected safe circled in red:



44.     VENCEL RELATIVE 1 SPOUSE said that VENCEL RELATIVE 1 SPOUSE did not see any firearms in the SUBJECT PREMISES when VENCEL RELATIVE 1 SPOUSE  was last present at the SUBJECT PREMISES on October 10, 2019.  However, as set forth above, I believe that there are likely firearms inside the suspected firearm safe on the SUBJECT PREMISES.  Furthermore, as set forth below, SHAWN MICHAEL VENCEL also told me during an interview on October 10, 2019 that there were firearms in the SUBJECT PREMISES.

45.     On October 16, 2019 VENCEL RELATIVE 1 told me that in the last couple of weeks VENCEL RELATIVE 4 gave various statements concerning the contents of the safe.  Sometimes, VENCEL RELATIVE 4 said that it contained valuables.  Other times, VENCEL RELATIVE 4 said that it contained documents.  VENCEL RELATIVE 4 has not mentioned the possible presence of firearms in the safe to VENCEL RELATIVE 1.

46.     VENCEL RELATIVE 1 SPOUSE   also told me that an escape tunnel used by SHAWN MICHAEL VENCEL may be present on the SUBJET PREMISES.  Specifically, a trap-door is present in a closet in the interior of the SUBJET PREMISES, located west of the kitchen.

47.     I have reviewed reports from BCSO case number 19-5034.  The matter regarded SHAWN MICHAEL VENCEL's possible assault of VENCEL RELATIVE 2.  One report was authored by Deputy Doug Woodard stated that deputies located a crawl space access in the closet of what was believed to be VENCEL's bedroom.

48.     On October 15, 2019, I spoke to Deputy Woodard about the crawl space access.  Deputy Woodward examined the crawl space access point and canines were later sent into its interior.  Among other things, Deputy Woodard told me that a patio is located on the northwest corner of the exterior of the main house of the SUBJECT PREMISES.  An exterior door is present on the south end of the patio which leads to an interior bedroom.  A closet within the bedroom has false bottom.  A passageway approximately five feet long leads to a larger crawl space beneath the main house.  Deputy Woodard heard that a tunnel may lead from the crawl space to a separate well pump-house on the property.  Canines searched the crawl space for VENCEL and did not alert.  Deputies did not access the area.

49.     Approximately two weeks ago, Deputy Woodard was again present on the SUBJECT PREMISES on another matter.  Deputy Woodward located a doghouse-like structure located approximately fifty feet from the main house.  The doghouse-like structure contained a hatch, which appeared to be unable to accommodate an average-sized male.

50.     On October 10, 2019, I interviewed SHAWN MICHAEL VENCEL at the Boulder County Jail.  Before commencing the interview I advised VENCEL of his *Miranda*

rights, confirmed that he understood those rights, and confirmed that he wished to speak with me voluntarily.  During the interview, in sum and substance and in pertinent part, VENCEL told me the following:

A.      VENCEL stated that he purchased the identity of VICTIM DOCTOR 1 on what he called the "dark web," specifically a website called "dream market."  According to VENCEL, he had learned how to access the dark web using what he called "TOR"[8] VENCEL said he had been told how to use TOR by a man named AUSTIN HERMSON (phonetic) with whom he had previously been incarcerated.

B.      VENCEL maintained that he did not believe VICTIM DOCTOR 1 to be a real person.  He stated, instead, that he was under the impression the identity was a fake one that had been "grown" over time using small purchases to establish a credit history.  He called this type of identity a "farmed" identity.  He said that the dream market ad for the identity packet had described it as such.

C.      VENCEL said that the identity packet he purchased gave him a digital list with VICTIM DOCTOR 1's name, birth date and Social Security number.  He said that he then: took a photo of himself with his phone; emailed it to himself so he'd have it on his computer; and then uploaded the photograph.  About a week later, VENCEL received a Texas driver's license in the name of VICTIM DOCTOR 1.

D.      VENCEL admitted to being the owner of Mile High Defenders, which he said was the business of modifying and selling Land Rover Defender sport utility vehicles.

E.      VENCEL had conflicting statements about the Ford F150.  At first VENCEL did not remember the presence of any ammunition in its back area.  Later, when I asked if the ammunition was VENCEL's, he responded affirmatively.  Still later VENCEL stated he preferred not to answer questions about the ammunition.

F.      VENCEL is a drug addict.  VENCEL is addicted to heroin and methamphetamines.  VENCEL also takes oxycodone, but noted the drug causes him little effect.

G.      VENCEL met HERMSON while the pair were previously incarcerated together in the Denver County Jail.  VENCEL was unaware of Dream Market prior to being incarcerated.  VENCEL could not recall HERMSON's complete telephone number, but stated it was located within the SUBJECT TELEPHONE.

---

[8] I know, from my training and experience, that this is an acronym for The Onion Router, which is a means used to surreptitiously access the internet.

H.      VENCEL denied possessing any firearms.  However, he stated that there were three firearms located on the couch at the SUBJECT PREMISES.  VENCEL said the firearms belonged to VENCEL's father, uncle or grandfather but later said that VENCEL's father did not reside in Colorado and that the guns were "kind of" in VENCEL's possession because "what else am I going to do with them… Can't send them in the mail." The firearms consist of a single-shot twelve gauge shotgun, a single shot .22 and a .30-06 ("thirty aught six"). VENCEL said there is no ammunition present at the SUBJECT PREMISES.  Approximately six months ago, VENCEL traded an assault rifle to HERMSON in exchange for heroin.  VENCEL's grandmother purchased the assault rifle.  HERMSON told VENCEL the assault rifle was discarded into a dumpster; VENCEL doesn't believe HERMSON discarded the assault rifle.

I.      VENCEL paid for VICTIM DOCTOR 1's identity from Dream Maker via Bitcoin.

51.      I submit there is probable cause to believe that evidence, fruits, and instrumentalities of the SUBJECT CRIMES, described in **ATTACHMENT B** will be found at the SUBJECT PREMISES described in **ATTACHMENT A**, for the following reasons:

A.      As set forth above, while VENCEL RELATIVE 1 SPOUSE found no visible firearms at the location on October 10, 2019, there is reason to believe that firearms will be found inside a gun safe in the garage on the SUBJECT PREMISES or in other containers, tunnels and hiding places located thereon;

B.      As set forth above, VENCEL RELATIVE 1 SPOUSE found what VENCEL RELATIVE 1 SPOUSE believed to be drugs and drug paraphernalia inside the SUBJECT PREMISES.

C.      As set forth above, SHAWN MICHAEL VENCEL told me on October 10, 2019 that there were, in fact, firearms at that location that he "kind of" possessed.  In addition, there is probable cause to believe that SHAWN MICHAEL VENCEL has appropriated the identities of others, that he has used those identities to obtain cash.  Also as set forth above, when VENCEL was arrested at VICTIM CAR DEALERSHIP he had receipts from sporting goods stores and possessed ammunition.  Past incidents set forth above — including VENCEL's admission that he traded an assault rifle to HERMSON — indicated that VENCEL trades in firearms.  These circumstances indicate that VENCEL, who is prohibited from possessing firearms, may have purchased firearms or ammunition using these identities.  The SUBJECT PREMISES is the most likely place for VENCEL to hide and secure such firearms.

D.      As set forth above, VENCEL RELATIVE 1 found documents at the SUBJECT PREMISES indicating that VENCEL was receiving mail in the names of other

people.  VENCEL RELATIVE 1 indicated to me that any mail not addressed to VENCEL RELATIVES 2 and 3 was not subjected to mail forwarding.  Therefore, I believe such mail may be located at the SUBJECT PREMISES.

      E.     As set forth above, there is probable cause to believe that VENCEL intentionally burned down the garage of the SUBJECT PREMISES, which was insured. Therefore, I submit that further investigation of the garage by a trained fire investigator(s) may reveal evidence of arson.

      F.     As set forth above, there is reason to believe that an escape tunnel is present or may be present connecting VENCEL's bedroom to a pump house.  The tunnel is large enough to serve as a hiding space for firearms or other evidence, fruits and instrumentalities of the crime and, as set forth above, there is reason to believe VENCEL has used the escape tunnel. I submit there is probable cause to search the tunnel.

      G.     As set forth above, VENCEL has a habit of maintaining documents, drug paraphernalia, ammunition and other materials that may constitute evidence, fruits and instrumentalities of the SUBJECT CRIMES inside vehicles.  I therefore submit that there is probable cause to search inside any vehicles or vessels that may be present on the SUBJECT PREMISES.

    52.    I submit there is probable cause to believe that evidence, fruits, and instrumentalities of the SUBJECT CRIMES, described in **ATTACHMENT D** will be found on the SUBJECT DEVICE described in **ATTACHMENT C**, for the following reasons:

      A.     As set forth above, SHAWN MICHAEL VENCEL told me on October 10, 2019 that contact information for AUSTIN HERMSON was on the SUBJECT DEVICE. VENCEL told me that HERMSON took an assault rifle from VENCEL in return for heroin.  In my training and experience, such a transaction would need to be arranged using a communication device.  I do not know how long VENCEL possessed and used the SUBECT DEVICE before it was found on his person when he was arrested on October 7, 2019.  However, I do know that information from previous phones can be transferred onto more recently purchased phones.  In my training and experience individuals often do this when purchasing new phones so that they can maintain communication with their network of friends and family.  For this reason, even if the phone is relatively new it is still likely to contain information about VENCEL's interactions with HERMSON that would constitute evidence, fruits or instrumentalities of the SUBJECT CRIMES.

      B.     As set forth above, VENCEL previously told Arvada Police officers that he purchased VICTIM DOCTOR 1's identity from "Austin," who I believe to be the same

AUSTIN HERMSON he spoke of on October 10, 2019. While the account of how VENCEL obtained VICTIM DOCTOR 1's identity relayed to Arvada Police officers is different from the account he gave to me, either account would be consistent with using the SUBJECT DEVICE to communicate with "Austin" (i.e., VENCEL could have either through directly communicated with Austin using the phone or he could have communicated with him via dream market, email or some other application on the SUBJECT DEVICE) about obtaining VICTIM DOCTOR 1's identity.  VENCEL provided phone numbers to his victims, including VICTIM CAR DEALERSHIP and VICTIM LANDLORD 2, which shows that he uses telephones to contact his victims. I do not know if the SUBJECT DEVICE is assigned the same number given to VICTIM CAR DEALERSHIP or VICTIM LANDLORD 2.  But in my experience, phone numbers can be easily ported from device to device or even "spoofed" on one device.  I submit it is likely that the device contains evidence related to the SUBEJCT CRIMES, including communications in which VENCEL portrays himself as others, seeks out credit, cash, or merchandise in the names of others; or communicates with others about the SUBJECT CRIMES.  As set forth above in the section describing the capabilities of modern smartphones, the SUBJECT DEVICE may also contain location information putting him at the location of the crimes, such as VICTIM CAR DEALERSHIP.

C.      As set forth above, there is evidence showing that VENCEL was using heroin during this time period and that he was actively involved in drug transactions, such as trading an assault rifle to AUSTIN HERMSON in return for heroin.  Given VENCEL's admitted and suspected involvement in drug transactions, I submit it is highly likely that the SUBJECT DEVICE contains communications used to set up, organize and otherwise facilitate them.  As set forth above in the section describing the capabilities of modern smartphones, the SUBJECT DEVICE may also contain location information putting VENCEL in the vicinity of known drug transactions.

## **CONCLUSION**

53.    Based on the investigation described above, probable cause exists to believe that the SUBJECT PREMISES described in **ATTACHMENT A**, contains fruits, evidence and instrumentalities of violation(s) of the SUBJECT CRIMES described in **ATTACHMENT B**.  I submit that probable cause also exists that the SUBJECT DEVICE described in **ATTACHMENT C** contains fruits, evidence and instrumentalities of violation(s) of the SUBJECT CRIMES described in **ATTACHMENT D**.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.


*/s Justin Stern*_____
Special Agent Justin Stern
Federal Bureau of Investigation


SUBSCRIBED and SWORN before me this 16th day of October, 2019

_____
HON. S. KATO CREWS
UNITED STATES MAGISTRATE JUDGE


Application for search warrant was reviewed and is submitted by Bryan David Fields, Assistant United States Attorney.

**ATTACHMENT A**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

The SUBJECT PREMISES is a single family house with a fire-damaged garage located at 5515 South Boulder Road, Boulder, Colorado, 80303 in unincorporated Boulder County, including underground passageways and spaces connecting the SUBJECT PREMISES to a well-pump house, outbuildings, storage sheds, other structures and vehicles and vessels present on the property. The home is located on the north side of South Boulder Road, in between 55th Street and Manhattan Drive, directly west of the South Boulder Bible Church. The front door and garage face south. The home is one story tall and abuts a separate garage structure. The garage structure is one story tall and is built of bricks and wood, but has extensive fire damage. The exterior of the home appears to be constructed of brick with a chimney covered in green siding. A tree is present in the front of the house. The home is shown in the following photographs:



1



# ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

### A. ITEMS TO BE SEIZED AND SEARCHED

For the SUBJECT PREMISES described in ATTACHMENT A, the following items, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of federal law, including Title 18, United States Code, Sections 844(h) (arson in commission of mail and wire fraud), 922 (felon in possession of a firearm), 1028A (aggravated identity theft), 1343 (wire fraud) and 1344 (bank fraud) as well as federal drug laws, including Title 21, United States Code, Sections 841(a)(1) and (b) (distributing and possessing with intent to distribute oxycodone, a Schedule II controlled substance), and 843(a)(3) (acquiring controlled substances through fraud) **(hereinafter "SUBJECT CRIMES")**:

1. Any and all information, information, records, documents, photographs, invoices and materials, in any format and medium, pertaining to violations of **SUBJECT CRIMES**.

2. Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by SHAWN MICHAEL VENCEL for the purpose of committing violations of **SUBJECT CRIMES**.

3. Any weapons to include firearms, explosives, other dangerous weapons, and ammunition.

4. Credit card information, bills, and payment records pertaining to violations of **SUBJECT CRIMES**.

5. Information, records, documents, or materials showing or tending to show the commission of, or connecting or tending to connect a person to violations of **SUBJECT CRIMES**.

6. Safes; lock boxes; securable filing cabinets; locking storage containers or apparatus; including keys, combinations or other means required to open, examine and seize such items.

7. United States currency, checks, money orders, cashier's checks, negotiable financial instruments or other forms of payment or records thereof.

8. Financial records to include bank records, money order receipts, automatic teller machine receipts, wire transfers or other records.

9. Identification documents, including drivers licenses, passports, state ID cards and anything else that could serve as a means of identification.

10. Mixtures, substances and materials determined to be controlled substances.

11. Indicia of ownership or occupancy of the search property.

1

12. Items determined to have been used for the packaging, weighing, transportation, storage, processing or use or sale of controlled substances.

13. Surveillance equipment, security cameras, or recording devices for security systems.

14. Any and all information, documents, records, photos, or correspondence regarding an individual known as "Austin" pertaining to violations of the **SUBJECT CRIMES.**

15. Any and all information, documents, records, photos, or correspondence regarding VENCEL RELATIVE 4 regarding insurance claims on the SUBJECT PREMISES that pertain to the **SUBJECT CRIMES**.

16. Any and all information, documents, records, photos, or correspondence regarding VICTIM DOCTOR 1 that pertain to the **SUBJECT CRIMES.**

17. Any and all information, documents, records, photos, or correspondence regarding pharmacists and doctors, including PHARMACISTS 1 and 2 and VICTIM DOCTOR 2 that pertain to the **SUBJECT CRIMES**.

18. Any and all information, documents, records, photos, or correspondence regarding VICTIM CAR DEALERSHIP that pertain to the **SUBJECT CRIMES.**

19. Any and all information, documents, records, photos, or correspondence regarding VICTIM LANDLORDS 1 and 2 that pertain to the **SUBJECT CRIMES**.

20. Any and all information, documents, records, photos, or correspondence regarding VICTIM INSURANCE COMPANY that pertain to the **SUBJECT CRIMES**.

21. Any and all information, documents, records, photos, titles, or correspondence regarding VICTIM TITLE COMPANY that pertain to the **SUBJECT CRIMES**.

22. Items and documents showing the ownership of vehicles and vessels, including photographs, license plates and vehicle registration documents.

23. Any paperwork reflecting the rental of a storage locker, other rental facility or other property in which controlled substances or documents pertaining to the **SUBJECT CRIMES** could be stored

24. Computers, phones, and digital storage devices that contain evidence of or were used to commit the **SUBJECT CRIMES**

## B.  SAFES AND LOCKED STORAGE CONTAINERS

Safes and locked storage containers found on the SUBJECT PREMISES described in ATTACHMENT A may be accessed as part of the search for the items identified above in Section A, including by means of forced entry.

2

**C.  FIRE INVESTIGATION**

The SUBJECT PREMISES described in ATTACHMENT A may be searched for evidence regarding the origins, source, nature, scope, and extent of any fires and for other evidence pertaining to the **SUBJECT CRIMES**, including by means of invasive techniques deemed necessary by trained fire investigators.

**ATTACHMENT C**

**<u>DESCRIPTION OF LOCATION TO BE SEARCHED</u>**

A black Apple iPhone in a black case, held at the Boulder County Sheriff's Office Evidence Section, 5600 Flatiron Parkway, Boulder, Colorado 8030, as part of case number 19-4024, item AJM-1.

.

# ATTACHMENT D

## DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

For the SUBJECT DEVICE listed and described in ATTACHMENT C, the following items, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of federal law, including Title 18, United States Code, Sections 844(h) (arson in commission of mail and wire fraud), 922 (felon in possession of a firearm), 1028A (aggravated identity theft), 1343 (wire fraud) and 1344 (bank fraud) as well as federal drug laws, including Title 21, United States Code, Sections 841(a)(1) and (b) (distributing and possessing with intent to distribute oxycodone, a Schedule II controlled substance), and 843(a)(3) (acquiring controlled substances through fraud) **(hereinafter "SUBJECT CRIMES")**:

1. Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of **SUBJECT CRIMES**:

2. Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the SUBJECT DEVICE or by other means for the purpose of committing violations of **SUBJECT CRIMES**.

3. Any and all information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to violations of **SUBJECT CRIMES**.

4. Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to violations of **SUBJECT CRIMES**.

5. Records of Internet activity, including Internet Protocol addresses, firewall logs, transactions with Internet hosting providers, co-located computer systems, cloud computing services, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses pertaining to violations of **SUBJECT CRIMES** or that show who used, owned, possessed, or controlled the Device(s).

6. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium, pertaining to use or ownership of the Device(s), or that aid in the identification of persons involved in violations of **SUBJECT CRIMES**.

7. Credit card information, bills, and payment records pertaining to violations of **SUBJECT CRIMES**.

8. Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of **SUBJECT CRIMES**.

9. Evidence of who used, owned, or controlled the SUBJECT DEVICE to commit or facilitate the commission of the crimes described, or at the time the things described in this warrant were created, edited, or deleted, including photographs, videos, logs, call logs, phonebooks, address books, contacts, IP addresses, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, search terms, metadata, user profiles, e-mail, e-mail contacts, messages (text or voice), instant messaging logs, file structure and correspondence.

10. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium regarding an individual known as "Austin" pertaining to violations of the **SUBJECT CRIMES.**

11. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium regarding VENCEL RELATIVE 4 regarding insurance claims on the SUBJECT PREMISES that pertain to the **SUBJECT CRIMES**.

12. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium regarding VICTIM DOCTOR 1 that pertain to the **SUBJECT CRIMES.**

13. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium regarding pharmacists and doctors, including PHARMACISTS 1 and 2 and VICTIM DOCTOR 2 that pertain to the **SUBJECT CRIMES**.

14. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium regarding VICTIM CAR DEALERSHIP that pertain to the **SUBJECT CRIMES.**

15. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium regarding VICTIM LANDLORDS 1 and 2 that pertain to the **SUBJECT CRIMES**.

16. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium regarding VICTIM INSURANCE COMPANY that pertain to the **SUBJECT CRIMES**.

17. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium regarding VICTIM TITLE COMPANY that pertain to the **SUBJECT CRIMES**.

18. Evidence of software that may allow others to control the SUBJECT DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security provisions or software designed to detect malicious software or unauthorized use of the device, and evidence of the lack of such malicious software.

19. Evidence of the attachment to the SUBJECT DEVICE of other storage devices or similar containers for electronic evidence.

20. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the SUBJECT DEVICE.

21. Evidence of how and when the SUBJECT DEVICE were used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

22. The telephone number, ESN number, IMEI, serial number, and/or SIM card numbers of or contained in the SUBJECT DEVICE.

23. Passwords, encryption keys, and other access devices that may be necessary to access the SUBJECT DEVICE.

24. Contextual information necessary to understand the evidence described in this attachment.

DEFINITIONS:

25. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).